Sam HARRIS, Jr., Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 90–SC–928–MR.

Supreme Court of Kentucky.

Sept. 24, 1992.

Rehearing Denied March 18, 1993.

Larry H. Marshall, Asst. Public Advocate, Department of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Todd D. Ferguson, Asst. Atty. Gen., Frankfort, for appellee.

SPAIN, Justice.

Harris was convicted by a Fayette County jury of second-degree burglary, first-degree rape, and attempted first-degree sodomy. The jury recommended Harris's punishment be fixed at five years for the burglary, nineteen years for the rape, and five years for the attempted sodomy, the sentences to be run consecutively. Pursuant to the jury's recommendation, the trial court ordered Harris to serve a total prison sentence of twenty-nine years.

The victim testified that on July 7, 1989, she had gone to bed in her trailer home at around 11:00 p.m. She was later awakened by a man attempting to perform oral sex on her. She repelled this initial attack by the burglar but was unable to prevent him from raping her. During the rape, the attacker threatened to force the victim to perform oral sex on him but instead fled the trailer after ejaculating. The victim was unable to identify her attacker but believed that he was a tall, strong, black man.

The victim notified the authorities who took her to a hospital for rape examination where samples of semen were procured. During their initial investigation, the police were led to Harris as a possible suspect. He denied involvement in the rape but agreed to be subjected to a male rape examination. The Kentucky State Police forensic serologists then examined the specimens from each of the rape kits but could not link the semen found on the victim to the appellant.

The serologist transferred the samples to the DNA[1] Analysis Unit of the FBI Laboratory. Dr. Dwight Adams, special agent working in the DNA Analysis Unit, ultimately determined that the DNA profile of the semen found on the victim matched the DNA profile of the blood given by Harris. He stated that the "DNA from the semen on the vaginal swab matches with all four probes the DNA from the known blood sample of Sam Harris"; and that the "likelihood of finding another unrelated individual from the black population, having a DNA profile like Mr. Harris, is approximately one in eight million."

Harris was arrested on the evening of February 17, 1990, in Harlan County, Kentucky, and temporarily placed in the Harlan County Jail, while awaiting the arrival of Officer Sharp and Detective Dalton from Lexington, Kentucky. When they arrived at about 1:00 a.m., they advised Harris of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.

---

**1.** "DNA" stands for deoxyribonucleic acid, which "is an organic substance found in the chromosomes in the nucleus of a cell. It pro-vides the genetic code which determines a person's characteristics." *Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436, 437, n. 1 (1990).

1602, 16 L.Ed.2d 694 (1966). Harris indicated that he understood his rights. Harris was then transported by these officers to Lexington where they arrived at approximately 4:00 a.m. The record indicates that there was no discussion of the case during the ride to Lexington, and that Harris slept during part of the trip.

Harris was questioned by Officer Sharp and Detective Turley concerning the crimes. The interrogation was videotaped without the knowledge of Harris. Harris was twice again advised of his constitutional rights by Officer Sharp and Detective Turley prior to being questioned about the crimes, one instance occurring on the videotape. Harris again stated each time that he understood his rights. The questioning resulted in a videotaped confession by Harris to the crimes. While in custody and throughout the interrogation, Harris never requested the presence of an attorney or asked to terminate the questioning. He did not complain of tiredness nor was he unresponsive or incoherent. Harris was aware of the results of the DNA test prior to giving his statement.

Defense counsel made a pretrial motion to suppress the results of the DNA test and the confession. Memorandums were filed by the parties on both issues. A hearing was then held on October 3, 1990, wherein Dr. Adams and a second expert witness testified for the Commonwealth in support of the admission of the DNA test results. Dr. Adams stated in the hearing that the FBI uses the technology known as Restriction Fragment Length Polymorphism (RFLP) to identify differences in DNA from one person to another. He set out for the trial court the elaborate procedure utilized by the FBI to analyze a person's DNA.[2] Dr. Adams testified that the RFLP analysis has been utilized in the medical field for the diagnosis of cancer and other diseases since the late 1970s or early 1980s, and that the FBI began to use DNA for identification purposes in the mid-1980s.

Regarding the accuracy of the test and the quality control surrounding the testing procedure, Dr. Adams stated that the FBI has a protocol for the RFLP analysis, which is followed from the beginning to the end of the process, and is never varied. He testified that he routinely undergoes proficiency tests and that he has yet to make a mistake on a test. Dr. Adams further stated that the statistical analysis is reliable and is actually a very conservative estimate of the likelihood of finding another individual with the same DNA profile. Moreover, in this case, Dr. Adams stated that the quality control measures showed that the DNA tests were done correctly.

The second witness called by the Commonwealth was Dr. David Goldman, a geneticist who is the chief of genetics research at the National Institute of Health. The trial court recognized Dr. Goldman as an expert in the fields of molecular biology and population genetics.

Dr. Goldman testified that the DNA testing procedures used by the FBI for RFLP analysis are variants of procedures that are in extremely wide use; that there are no substantial, distinguishing differences in the techniques; that they are "extraordinarily accurate"; and that these techniques have undergone extensive peer review. Dr. Goldman stated that the FBI's methodologies are looked upon very favorably and generally acknowledged to contain appropriate quality controls, and that their frequency calculations are conservative and objective. Finally, Dr. Goldman concluded that the FBI's DNA testing procedures are widely accepted in the scientific community.

No witnesses were called by defense counsel to rebut this evidence, nor did the trial court call any independent experts to supplement the record. Defense counsel nevertheless cross-examined both Dr. Adams and Dr. Goldman extensively.

---

2. The statistical probability that the DNA prints match "is based on the probability that a random individual has the same DNA banding pattern as the sample." *State v. Schwartz*, Minn., 447 N.W.2d 422, 428 (1989). In this case the statistical probability of someone other than Harris providing a match was approximately one in eight million, based on the applicable population base.

The trial court ruled in an opinion and order that "38 states have likewise found this procedure to be accepted" and that DNA testing has become widely accepted among the scientific community as a reliable and accurate technological procedure and, therefore, its results were admissible. The trial court also ruled the confession admissible in a separate opinion and order. At trial, the court admitted both the confession and the DNA evidence over defense counsel's objection. Harris testified on his own behalf and admitted the burglary and rape charges, but denied attempting to engage in deviate sexual intercourse with the victim. Harris now appeals the decision of the trial court to admit the results of the DNA tests and the confession at trial, and the trial court's decision to deny his motion for a directed verdict on the charge of attempted first-degree sodomy.

■ In deciding whether to allow the admission of new, scientific evidence, this Court has required trial courts to follow the dictates of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).[3] It must be found by the trial court that the evidence "be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*, at 1014. The party offering the evidence has the burden of proving that this new evidence has gained general acceptance as reliable in the relevant scientific community. *Commonwealth v. Curnin*, 409 Mass. 218, 565 N.E.2d 440, 443 (1991). In this case, the trial court did not abuse its discretion when it decided to admit the results of the DNA test. However, this Court is unwilling, at this time, to embrace conclusively this "extraordinarily powerful and promising innovation," *United States v. Two Bulls*, 918 F.2d 56, 59 (8th Cir.1990), *en banc granted*, 925 F.2d 1127 (1991), in the absence of evidence which includes either expert witnesses called by the defense, or experts called by the trial court, to supplement or

rebut the prosecution's experts. Since DNA profiling is "relatively new and has been the subject of controversy in both the legal and scientific fields," *Two Bulls, supra* at 58, and can be helpful to both the prosecution and the defense, we believe that it is only prudent for this Court to approach this issue on a case-by-case basis.

■ We next find that the trial court did not abuse its discretion when it admitted the videotaped confession of Harris. Harris was fully advised of his constitutional rights required under *Miranda* on three occasions prior to giving the statement. On each occasion when asked, Harris acknowledged that he understood his rights. He did not request an attorney nor did he ask the police to stop the interrogation. Nothing in the record indicates that Harris was incoherent, intoxicated, or influenced by fatigue. In fact, it is undisputed that Harris slept part of the way on the three-hour trip from Harlan to Lexington. The confession was voluntarily given by Harris, and judging from the totality of the circumstances, we certainly cannot conclude that its admission into evidence was clearly erroneous. *Miranda, supra; Allee v. Commonwealth*, Ky., 454 S.W.2d 336, 341 (1970).

■ Finally, we hold that the trial court properly denied Harris's motion for a directed verdict on the charge of attempted sodomy. The victim testified that she was awakened by a naked man attempting to have oral sex with her. Failing this, he then began to rape her and, thereafter, threatened to force her to perform oral sex on him. This evidence is sufficient to satisfy the "substantial step" requirement of KRS 506.010 and KRS 510.070. Taking the evidence as a whole, we do not find it to have been clearly erroneous for the jury to find the defendant guilty. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187

---

**3.** Examples of the application of the *Frye* test or its principles to scientific evidence can be found in *Dyer v. Commonwealth*, Ky., 816 S.W.2d 647 (1991) (profile evidence in sodomy cases); *See v. Commonwealth*, Ky., 746 S.W.2d 401 (1988) (HLA genetic marker paternity test); *Commonwealth v. Rose*, Ky., 725 S.W.2d 588 (1987) (battered wife syndrome); *Lantrip v. Common-*

*wealth*, Ky., 713 S.W.2d 816 (1985) (sexual abuse accommodation syndrome); *Honeycutt v. Commonwealth*, Ky., 408 S.W.2d 421 (1966) (radar); *Conley v. Commonwealth*, Ky., 382 S.W.2d 865 (1964) (polygraph test); *Dugan v. Commonwealth*, Ky., 333 S.W.2d 755 (1960) (truth serum test); and *Shelton v. Commonwealth*, 280 Ky. 733, 134 S.W.2d 653 (1940) (fingerprints).

(1991), *modifying Sawhill v. Commonwealth,* Ky., 660 S.W.2d 3, 4 (1983). No abuse of discretion occurred.

The judgment of conviction of the Fayette Circuit Court is affirmed.

COMBS, LAMBERT, LEIBSON, REYNOLDS and WINTERSHEIMER, JJ., concur.

WINTERSHEIMER, J., concurs by separate opinion in which SPAIN, J., joins.

STEPHENS, C.J., dissents by separate opinion.

WINTERSHEIMER, Justice, concurring.

I concur in the result achieved by the majority but wish to state my reasons for accepting the results of the DNA testing evidence.

The trial judge held a hearing at which the prosecution presented two witnesses, Drs. Adams and Goldman. The defense did not present any evidence although it vigorously cross-examined both of the expert witnesses.

Dr. Adams is a special agent of the F.B.I. with the DNA analysis unit. The trial judge recognized him as an expert in DNA analysis. Dr. Adams testified extensively and recognized that there are some individuals who disagree with some parts of the DNA process, but stated that the consensus in majority opinion is that the R.F.L.P. technology is capable of producing reliable results when performed accurately. Dr. Goldman, a geneticist at the National Institute of Health and a medical doctor who is chief of a genetics research section was also recognized, without objection, as an expert in the fields of molecular biology and population genetics. He testified that the procedures used are variance of procedures that are in extremely wide use, that there are no substantial, distinguishing differences in the techniques and that the techniques have undergone extensive peer review. He concluded that the procedures are widely accepted in the scientific community and when carried out correctly, are extraordinarily accurate.

A trial judge correctly followed the standards expressed in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and held that the prosecution had presented sufficient evidence that the DNA testing procedure and analysis has become widely accepted among scientific community as reliable and accurate. The trial court noted that the Congressional Office of Technology Assessment reported that 38 states have found DNA testing to be accepted among the scientific community.

The courts of last resort in nine states have held that both DNA testing results and probability calculations are admissible: Iowa, Kansas, South Dakota, North Carolina, South Carolina, Virginia, Arkansas, Indiana and West Virginia. *State v. Brown,* 470 N.W.2d 30 (Iowa 1991); *State v. Smith,* 248 Kan. 217, 807 P.2d 144 (1991); *State v. Wimberly,* 467 N.W.2d 499 (So.Dak.1991); *State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990); *State v. Ford,* 301 S.C. 485, 392 S.E.2d 781 (1990); *Spencer v. Commonwealth,* 238 Va. 275, 384 S.E.2d 775 (1989); *Prather v. State,* 50 Cr.Law 1254 (Ark.1991); *Hopkins v. State,* 579 N.E.2d 1297 (Ind.1991); *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989). In Georgia, *Caldwell v. State,* 260 Ga. 278, 393 S.E.2d 436 (1990), the Supreme Court held that DNA testing results were admissible but allowed only reduced probability calculations. Intermediate appellate courts in seven other states have held that both DNA testing and probability calculations are admissible, Florida, Maryland, Colorado, California, Illinois, Ohio and Texas. (Citations omitted.) Trial courts in New York have held DNA testing results and probability calculations are admissible. Three federal courts have held that DNA testing results in probability calculations are admissible.

Two states have not admitted the DNA evidence. They are Massachusetts and Minnesota. *Commonwealth v. Curnin,* 409 Mass. 218, 565 N.E.2d 440 (1991) and *State v. Schwartz,* 447 N.W.2d 422 (Minn. 1989). It is obvious that the overwhelming weight of medical and legal authority accepts the results of properly conducted DNA testing.

I can find no reason to adopt the procedure ordained by the majority which calls

for the trial court to make a redundant inquiry into further scientific evidence where none might exist. There is no need to further burden the taxpayers by such a superfluous inquiry when a valid standard currently exists which requires the trial judge to conduct a hearing to determine if the prosecution has presented sufficient evidence that a particular scientific procedure has become widely accepted in the scientific community as reliable and accurate. I can see no reason to further burden the defense by requiring it to challenge the experts by producing other experts. The defense should have the opportunity to vigorously and extensively cross-examine and handle the case as it decides. The adoption of a standard from California as expressed in the majority opinion is unnecessary and unduly burdensome on the people and trial courts of this Commonwealth.

SPAIN, J., joins in this concurring opinion.

STEPHENS, Chief Justice, dissenting.

Respectfully, I dissent.

The polestar case that this Court and an overwhelming majority of other Courts follow in determining the admissibility of new scientific tests or evidence is *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* requires the trial court to find that the tests are "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*, at 1014.

Harris was a suspect in a rape investigation. He agreed to be subjected to a physical evidence recovery examination. It was determined that the DNA profile of the semen found on the rape victim matched the DNA profile of the blood given by Harris.

Defense counsel made a pretrial motion to suppress the results of the DNA test. At a hearing on the issue, two expert witnesses, Dr. Dwight Adams, a special agent working in the DNA Analysis Unit of the FBI Laboratory and Dr. David Goldman, the Chief of Genetics Research at the National Institute of Health, testified for the Commonwealth. On cross-examination by defense counsel, the trial court did not allow Dr. Adams to state the opinions of those who disagree with the accuracy of forensic DNA analysis. No witnesses were called by defense counsel. The trial court did not call any independent experts to supplement the record.

The trial court ruled the DNA results admissible. At trial the DNA evidence was admitted over defense counsel's objection.

It is clear that the lower court failed to follow *Frye*. The trial court heard evidence only as to the accuracy and proficiency of DNA testing. No evidence was presented to rebut the Commonwealth's witnesses. Because there was no evidence presented which refuted the credibility of DNA testing, the trial court could not make an informed decision that DNA testing is sufficiently established to have gained general acceptance in the particular field in which it belongs.

In admitting the DNA evidence, the lower court did not comply with *Frye*. Nevertheless, the majority affirms the admission of the DNA testing. This case is particularly disturbing as it will be cited by prosecutors as precedent for the use of DNA evidence without compliance with the standards established in *Frye*.

To be in compliance with *Frye*, the trial court should

> *sua sponte* take the responsibility of inquiring not just whether the experts believe the scientific community is generally in agreement, but whether they are in fact aware of any opposing sentiment in the relevant scientific community. The court should then make an effort to ascertain the extent of any opposition so identified, calling its spokesmen as court-appointed experts if necessary.

*People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 153, 549 P.2d 1240, 1249 (1976) (quoting Comment, *The Voiceprint Dilemma: Should Voices be Seen and not Heard?* (1975) 35 Md.L.Rev. 267, 293.). Emphasis in original.

Because *Frye* was not followed and because the DNA evidence was damaging to Harris, I would reverse and remand, ordering the trial court to use *Frye* for the

foundation of determining the admissibility of DNA testing.