No. 67,425

State of Kansas, *Appellee,* v. Larnell L. Dykes, *Appellant.*

(847 P.2d 1214)

Opinion filed March 5, 1993.

*Reid T. Nelson,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Rachelle Worrall Smith,* assistant district attorney, *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

Lockett, J.: Larnell Dykes appeals his convictions of aggravated burglary, aggravated robbery, aggravated kidnapping, and rape. The defendant claims the trial court's denial of his request for the data base which the FBI used to determine the DNA match denied him his right to a fair trial.

On October 18, 1989, at approximately 10:20 a.m., C.H., a student at Wichita State University, pulled into a parking lot on the university campus. As she opened the car door, a black man

reached into the car and pointed a gun in her face. After the man took C.H.'s money and purse, he entered the car, took her driver's license from her purse, and required her to recite her address.

The robber started the car, threw C.H.'s wallet out the window, and then had her direct him to a bank. When they arrived at the bank, the man discovered the bank card was in the wallet he had thrown out of the car. After retrieving the wallet, he drove to the bank and had C.H. withdraw $150 from her account.

The assailant then drove around, stopped, and made C.H. get into the back seat of the car. After placing a coat over C.H.'s head, he removed her clothes, climbed into the back seat, and raped her. When he withdrew his penis, he ejaculated on her lower abdomen. The assailant pointed the gun at C.H. and threatened to shoot her if she identified him. He eventually parked the car, told C.H. not to leave for five minutes, and departed. C.H. later identified Larnell Dykes as her assailant.

A rape kit analysis revealed the presence of semen on the slacks C.H. was wearing. A sample was sent to the FBI for DNA analysis. At trial, a special agent with the FBI DNA analysis unit testified that the DNA from the semen on the slacks matched the DNA from the known blood sample of Larnell Dykes. He determined the test failed to exclude Dykes as being the donor of the semen on C.H.'s slacks. The agent testified that the probability of selecting another unrelated individual chosen at random from the black population having a profile similar to Dykes' is approximately one in six million.

Prior to DNA profiling, forensic experts used other DNA techniques to determine paternity and as a means of identification in criminal cases in Kansas. See *State ex rel. Hausner v. Blackman,* 233 Kan. 223, 662 P.2d 1183 (1983) (evidentiary value of blood grouping test in paternity action); *State v. Pioletti,* 246 Kan. 49, 51, 785 P.2d 963 (1990) (DNA analysis of blood on door of crematory identified as that of the offspring of the victim's parents).

In recent years however, a new method of DNA profiling is used to identify the human source of blood, semen, tissue, or hair samples. DNA profiling can inculpate criminal suspects by matching the suspect's genetic material with human genetic material obtained from a specimen left at the scene, on a murder

weapon, or on the suspect's clothes. This technique is useful in sexual assault cases where the DNA print of semen taken from the victim's body is compared with a DNA print taken from the suspect's blood. Although traditional forensic methods exist for comparing blood, hair, and semen, DNA profiling has the advantage of being performed on much smaller samples than traditional tests.

The initial case to accept DNA profiling was *Andrews v. State*, 533 So. 2d 841 (Fla. Dist. App. 1988), *rev. denied* 542 So. 2d 1332 (Fla. 1989). In Kansas, the admissibility of DNA profiling was first discussed and found to meet the standard of general acceptance in the scientific community and to be admissible on that basis in *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991).

Dykes asserts that the six million to one figure was devastating to his defense. He states the court's refusal to grant all of his discovery motion denied him his Sixth Amendment right to obtain an expert witness who could testify as to the DNA data base and denied him the right to cross-examine the State's expert witness.

K.S.A. 22-3212 provides in part:

"(1) Upon request, the prosecuting attorney shall permit the defendant to inspect and copy or photograph any relevant . . . (b) results or reports of physical or mental examinations, and of scientific tests or experiments *made in connection with the particular case*, or copies thereof, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; . . . [Emphasis added.]

(2) Upon request, the prosecuting attorney shall permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which are or have been within the possession, custody or control of the prosecution, and which are material to the case and will not place an unreasonable burden upon the prosecution."

K.S.A. 22-3212 requires that the information sought must be material to the particular case and capable of acquisition by the prosecution with the exercise of due diligence, and the production of the information must not place an unreasonable burden on the prosecution. Dykes' motion to discover the FBI data base is a 12-page blanket request for every conceivable document generated by the FBI and others relating to any and all DNA testing, the calculation of probabilities of population, genetic population,

and all information and tests used to compute the DNA data base. In part, the motion requests:

(1) A written copy of a hard or soft copy of any computer program describing the FBI's method for calculating frequencies of individual alleles and calculating combined frequencies of the various probes used.

(2) For each probe used in this case, the test relied upon for determining whether the population is in Hardy-Weinberg equilibrium, including the tables reflecting the raw phenotypic and genotypic data for the black population.

(3) The source of samples for the black population data base including the type, profession, or geographical region of people selected and the criteria for determining the samples came from blacks.

The motion also requested any information accompanying samples which pertains to the racial origin of the samples subject to proficiency testing, the names of all analysts who performed the test on the samples, and their notes, training, and results of the test.

K.S.A. 22-3212 allows the trial court broad discretion to require disclosure of documents and other tangible objects which may be in the possession of or under the control of the prosecution. The defendant has the burden of showing the materiality and reasonableness of the request. *State v. McQueen & Hardyway*, 224 Kan. 420, 430, 582 P.2d 251 (1978). One who asserts that the court has abused its discretion bears the burden of showing such abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. Stated another way, discretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion. *State v. Heywood*, 245 Kan. 615, 621, 783 P.2d 890 (1989).

The judge granted the defendant's discovery motion, in part, by limiting the discovery to items connected to this case and ordered the FBI to "release to the State lab notes, autorad[iograms] and testing protocol in reference to FBI file number 95-291661, lab number 00109037 S YN, by April 25, 1991." The State was ordered to produce the documents and give them to

the defendant after receipt. The balance of defendant's motion for discovery was denied. The State provided the defendant with the calculation of the frequencies requested in his motion. The FBI was unable to obtain the information on the black population data base.

Immediately prior to commencement of trial, Dykes again moved to discover the DNA data base. The defendant informed the judge that he had taken the DNA results to an expert. The expert had explained the test and the results. The defendant's expert was familiar with the FBI data base and the manner in which they used it, but the expert did not know what figures they had used or the exact geographical areas used to obtain the data base. The judge noted that the basic population data used in the DNA tests for this case is the same basic population data that is used in virtually every criminal case handled by the FBI and the same type of population data that is used for medical diagnosis. Dykes' second motion for unlimited discovery was denied.

Dykes' mother testified at trial that she had an unknown percentage of Cherokee Indian ancestry. Dykes argues that because of his Indian ancestry the history and details of the data base used by the FBI became relevant to the defense. Dykes argues that because of his "substantial" Cherokee Indian ancestry, a data base without Cherokee genealogy represented would underestimate the frequency of a DNA match occurring in a freely mixing black population which contains some Cherokee genealogy. Dykes contends even if the FBI did not possess specific figures of the data base, it could have supplied the defendant with the hospitals that did the data base. Dykes asserts the trial court erred in denying his motions for discovery.

To show he was entitled to the data base from the FBI, the defendant relies on *State v. Humphrey,* 217 Kan. 352, 537 P.2d 155 (1975). In *Humphrey,* the prosecution of the defendant was based on the testimony of an undercover agent for the Kansas Attorney General. Humphrey claimed he was denied his right of discovery by the court's failure to compel the county attorney to provide the criminal record of the special agent which might be contained in the files of the FBI or in the National Crime Information Center.

The *Humphrey* court recognized the importance of the right of effective cross-examination as a part of the constitutional right of confrontation of witnesses so that the credibility of a witness can be subjected to exploration to determine the weight to be given to his or her testimony. It noted that under federal statute, the attorney general was required to keep such records and exchange the information with authorized officials of states and cities. The court observed that the defendant's criminal record was easily requested and received by the State from the FBI. 217 Kan. at 360. It determined such information was of vital importance and, absent some good reason, justice required the trial judge to order the prosecutor to produce information pertaining to prior convictions of the special agent for crimes involving dishonesty or false statement which were admissible under K.S.A. 60-421 to impair the agent's credibility. 217 Kan. at 359. The *Humphrey* court found there was no good or sound reason to deny the defendant's discovery request and ordered a new trial.

In contrast, here, the FBI does not know the identity of the donors used to compile the data base. The data base made of 500 blacks was compiled in 1989 and made up of anonymous donors. It was impossible for the FBI to comply with the request. The defendant's discovery request placed an unreasonable burden on the State. *Humphrey* does not support the defendant's position.

The defendant's argument that he needed all the information requested in preparation of his defense to attack the one in six million figure is not sufficient for several reasons, and his claim is inappropriate.

First, the defendant's claim that he has a "substantial" Cherokee Indian genealogy is questionable. Dykes' mother testified she had an unknown percentage of Cherokee Indian blood. Further, if the defendant needed to delve into whether comparing himself with the American Indian data base would have resulted in a higher frequency of DNA similar to his in the population, he could have cross-examined the State's expert witness on the matter. The record of the defendant's cross-examination of the State's DNA expert witness is devoid of such questions.

Dykes' explanation as to why the discovery denial was improper is an attempt to challenge the longstanding acceptance of pop-

ulation studies. That acceptance was stated in *Smith v. Deppish*, 248 Kan. at 238. We noted that statistics based on population studies are admissible and that any challenge to the reliability of the testimony goes to its weight, not its admissibility, citing *State v. Washington*, 229 Kan. 47, 58-59, 622 P.2d 986 (1981). We held that population percentages on the possession of certain combinations of blood characteristics, based upon established facts, are admissible as relevant to identification. The data base was not novel to the defendant's case. The FBI's data base is used in all criminal cases.

The Hawaii Supreme Court's discussion of DNA testing in *State v. Montalbo*, 73 Hawaii 130, 828 P.2d 1274 (1992), is helpful. There, the court found little basis for concern over the theory underlying the statistical evidence. It noted that the statistics and the underlying sampling theory are not novel or controversial. It took judicial notice that the DNA paradigm is not controversial and is widely accepted in the relevant scientific community. It also recognized that the basic techniques underlying the analysis used by the FBI are widely accepted. W. C. Thompson & S. Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 60-61, 64-76 (1989). See, *e.g.*, *People v. Castro*, 144 Misc. 2d 956, 960, 545 N.Y.S.2d 985 (1989). It further noted the theory of DNA testing is "unanimously accepted amongst scientists and lawyers" and techniques are not novel but it is the transfer of the technique to the context of DNA forensic identification which has generated much of the dispute. 73 Hawaii at 141.

For evidence to be discoverable, the defendant *must show* that the evidence requested is in the possession or control of the prosecution and that it is relevant or material in the preparation of the defense. The mere entertaining of a hope that something of aid may be discovered is not sufficient. *State v. Campbell*, 217 Kan. 756, 782, 539 P.2d 329, *cert. denied* 423 U.S. 1017 (1975). Dykes' request was not limited to material generated in the testing of a sample from the defendant, but for information generated in the examination of individuals in other cases. Moreover, the requested information regarding the 500 donors used to compile the data base could not be obtained because the FBI did not know the identity of those donating for the data base.

The defendant has been unable to show how the requested materials were relevant to his case. In a nutshell, the defendant claims he needed the information to attack the data base of a theory "unanimously accepted amongst scientists and lawyers." The defendant's request can be characterized as a mere entertaining of hope that something of aid may be discovered. The information was not relevant or material to the preparation of his defense. See *State v. Campbell,* 217 Kan. at 782.

While DNA profiling meets the standard of general acceptance in the scientific community and thus is admissible on that basis, such test results may be inadmissible on grounds of relevancy or prejudice as well as under traditional challenges to admissibility of evidence such as contamination of the sample or chain of custody questions. *Smith v. Deppish,* 248 Kan. at 238.

The defendant failed to meet his burden at trial. On appeal, he fails to show an abuse of discretion in the court's partial denial of the discovery motion.

Affirmed.