NOT DESIGNATED FOR PUBLICATION

No. 113,232

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID D. BURRISS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed June 17, 2016.
Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., PIERRON and SCHROEDER, JJ.

*Per Curiam*: A jury convicted David D. Burriss of aggravated robbery and attempted kidnapping. Burriss challenges his convictions on a number of grounds. He argues a State's witness provided new statements shortly before trial, surprising him and unduly prejudicing his defense; the district court abused its discretion in denying his motion for a new trial based on misleading DNA evidence and prosecutorial misconduct; the court erred in failing to give a limiting instruction; and the cumulative effect of these errors deprived him of a fair trial. He also argues the court erred in categorizing his 1991

1

burglary juvenile adjudication as a person felony pursuant to *State v. Dickey*, 301 Kan. 1018, 1032, 350 P.3d 1054 (2015). We affirm.

On Wednesday, August 24, 2011, at 5:51 a.m., the Overland Park Police Department dispatch sent Officers Lucas Sitton, Brandon Faber, and Jay Roush to the Knights Inn hotel regarding a physical disturbance call. The officers went to an area around Room 289 where the disturbance appeared to have occurred. They found blood smeared on the door of Room 289 and a small trail of blood leading into the parking lot. The blood appeared to be fresh.

The officers followed the trail of blood into the parking lot where they found a set of keys with a key fob. Officer Sitton pressed the locking mechanisms on the fob, and the horn activated on a white Jeep Cherokee.

The officers returned to Room 289 and spoke with the three occupants of the room, Michael Tinsley, Misty Gleese, and Kelly Devault. None of them had bleeding injuries. The officers checked the room, but the occupants would not let them into the bathroom. Officer Sitton interviewed Gleese, who told him that earlier in the evening Tinsley and Devault had heard people outside. Gleese opened the door to the room and someone threw a bottle in her direction. Later, they heard more noise outside. Tinsley opened the door and saw a Hispanic male, who was bleeding from his head, walking toward the parking lot in the direction of the Jeep.

On the same day, at approximately 9:45 p.m., Charles Kramer drove his red pickup truck to a car wash near the Knights Inn and a QuikTrip. The car wash had several bays where customers could wash cars themselves. It also had good lighting and surveillance cameras.

2

Cramer washed his truck, then backed up into a vacuum stall. He got out of truck and began picking up trash and moving items so he could vacuum. As he was doing so, he saw a white car drive by very slowly down the street. Three men were in the car: a black male in the driver's seat, a white male in the front passenger seat, and another white male in the backseat. All three were wearing hats. The white car pulled into bay number 10 of the car wash.

As Cramer was putting quarters into the vacuum, a man approached him from the direction of bay 10. The man was wearing a dark hat, a white tank top, and khaki pants. The man had some bandages, bruises, and cuts on his face. Cramer recognized the man as the man in the backseat of the white car.

The man pointed a gun at Cramer's abdomen. He told Cramer, who was standing inside the open passenger door, to "Get in the fucking truck." Cramer refused. The man then demanded the keys, and Cramer gave them to him. The man told Cramer to get in the truck, and Cramer again refused. The man asked for Cramer's wallet, and Cramer complied. The man told Cramer to get in the truck at least four times, but Cramer never did. The man then told Cramer to shut the passenger door, which he did. The man went around to the driver's side, got in the truck, and drove off. The entire incident took about a minute.

Cramer immediately dialed 911. The white car drove past and exited in the opposite direction from the man in Cramer's truck. Cramer noticed the same two men were in the front seats of the white car, but the man in the backseat was no longer there.

On August 26, 2011, the police department received notification that Cramer's truck had been recovered and was at Independence Tow in Kansas City. Douglas Borcherding, a crime scene detective for the Overland Park Police Department, went to

3

Independence Tow to photograph the truck. He also swabbed the interior of the driver's door, the steering wheel, and the gearshift handle for DNA evidence.

On that same day, the police also notified Cramer that his truck was at Independence Tow, and he went to pick it up. Cramer found a number of items in the vehicle that did not belong to him, including a razor blade in the ashtray, french fries all over the inside, and a bucket in the backseat. After driving home, Cramer made plans for Detective Laurie Bridges to come to his home and remove the items that did not belong to him from his truck. Before Detective Bridges was able to make it out to his home, however, someone appeared to have broken into the truck. One morning, Cramer found the truck with the doors opened. French fries were strewn across the driveway, and a little plastic rose, which did not belong to Cramer, was missing from the truck.

Agent Chad Simmons, of the Secret Service, was working on a counterfeit currency investigation with the Overland Park Police Department in September 2011. Brent Minton was one of the targets of Simmons' investigation. Minton initially gave Burriss' name to Agent Simmons. On September 12, 2011, Agent Simmons suggested that Detective Bridges should look into Burriss as a possible suspect in the aggravated robbery. Before getting Burriss' name from Simmons, Detective Bridges did not have a suspect.

Based on Simmons' suggestion, Detective Bridges put together a photo lineup of six photos, including Burriss' driver's license photo. On September 14, 2011, Cramer viewed the photo lineup and immediately picked out Burriss. Cramer had no doubt that Burriss was the man who stole his truck.

At trial, Gleese testified that in August 2011 she had known Burriss for about a month. She had identified Burriss as her boyfriend to Agent Simmons. She had met Burriss through Tinsley, who she had known for about 6 months.

4

Gleese testified that in August 2011 she, Burriss, Tinsley, and Devault were staying at the Knights Inn and they were using a white Jeep Cherokee to get around. On the morning of August 24, 2011, she found Burriss in the parking lot bleeding from his forehead. She bandaged his wounds and used a hat to hold the bandage on. Gleese hid Burriss in the bathroom when the police showed up to their hotel room. She then lied to the police about what had happened. The police towed the white Jeep, which was their only mode of transportation.

According to Gleese, Darrell Smith, a black male, showed up in a white car later that day. Smith, Tinsley, and Burriss then left together. Prior to leaving, they told Gleese they were going to work, even though they did not have jobs. Gleese interpreted this to mean they were going to steal.

After being gone only 30 to 40 minutes, Smith and Tinsley returned to the hotel. According to Gleese, they appeared agitated. They told her to hurry up and get her stuff because they had to get out of there. Smith, Tinsley, Devault, and Gleese got in Smith's car and drove to the QuikTrip across the street from the Knights Inn. At the QuikTrip, Gleese and Tinsley got out of Smith's car and into a red extended cab pickup truck that Burriss was driving. Burriss drove the truck to Kansas City. After dropping off the truck, Gleese heard Burriss ask someone if the car wash had surveillance cameras.

Gleese also identified the man in the surveillance camera footage of the carjacking as Burriss. She had originally been shown still photographs taken from the video and said she could not tell if it was Burriss. After viewing the video the day before trial, however, Gleese was able to identify Burriss in the video. She said she was able to identify him because he was wearing the tank top and hat he usually wore. Gleese added, "The clothes that he had on, the way that he walked, it just–that's what I felt. That's what I thought."

5

Kelly McGill Carroll, a DNA analyst for the Johnson County Sheriff's Office Crime Laboratory, testified the DNA profile of the blood found on the door of Room 289 at the Knights Inn matched Burriss with a statistical weight of one in 173.1 quintillion. According to Carroll, at least three people contributed to the DNA profile from the steering wheel of Cramer's truck. She testified that neither Cramer nor Burriss could be excluded from the profile. She also stated there was a one in three chance that a random person could not be excluded from the DNA profile from the steering wheel.

Tinsley testified at trial on behalf of the defense. Prior to his testimony, the parties reached an agreement that the State would not question Tinsley about any matters that would require him to invoke his rights under the Fifth Amendment to the United States Constitution. Specifically, the parties agreed not to ask Tinsley about any cars or trucks, including identifying them or asking whether Tinsley had been in them.

On direct examination, Tinsley testified he believed the man in the surveillance footage was Minton and not Burriss. He did not believe it was Burriss because "[Burriss] didn't wear white shirts, especially wife beaters." On cross-examination, Tinsley admitted he had never told the police he believed the man was Minton. While the State was attempting to impeach Tinsley based on his prior statements to police, Tinsley asserted his Fifth Amendment rights. Because of his refusal to answer, the State moved to have all of his testimony stricken. The court denied the State's request.

Burriss also took the stand in his own defense. He rolled up both his sleeves while on the stand to show the jury his tattoos because the man in the surveillance video did not appear to have any tattoos. Burriss testified he had had the tattoos since 1994. Burriss identified the man in the surveillance video as Minton. In the State's rebuttal, Agent Simmons testified Burriss was taller than Minton and Minton had numerous tattoos all over his body in September 2011.

6

The jury found Burriss guilty of aggravated robbery and attempted kidnapping. Burriss moved for a new trial, but the district court denied his motion. Burriss appeals his convictions, sentence, and the denial of his motion for a new trial.

Burriss first argues the district court erred in allowing Gleese to testify about new statements she made shortly before the trial began.

The State moved to endorse Gleese as a witness on January 29, 2013. Prior to testifying, Gleese spoke with law enforcement officials several times regarding the aggravated robbery at the car wash. She had spoken with Agent Simmons and Detective Dennis Reaser from the Overland Park Police Department in September 2011. She had spoken with Detective Bridges and Agent Simmons in February 2013.

After speaking with Gleese the second time, investigators for the State had not been able to contact Gleese for several months. Agent Simmons was able to track Gleese down at a halfway house, but she would not come to the door nor would the halfway house confirm she was staying there. Agent Simmons left a subpoena at the halfway house. Gleese showed up at the prosecutor's office at 11 a.m. on the first day of trial. She spoke with Detective Bridges that day, August 12, 2011, and the next day, August 13, 2011.

As the State explained the situation to the district court outside the presence of the jury:

> "It's my knowledge as far as this case is concerned she has been interviewed twice. The first time–well, twice before today.
>> "The first time is September 13th of 2011, with [Agent Simmons] and [Detective Reaser]. That report was scanned into our office January 22nd of this year. So Mr. Smith should have it.

"Within that report the detectives were asking her about what she knew about this carjacking that we're dealing with. She indicated being with Mr. Burriss at the Knights Inn. And she knew that he had asked people if the car wash by the Knights Inn had a video. And she put that time frame in August of 2011.

"She was later interviewed by Detective Bridges [in] February of this year where she gave another statement. That's also been scanned into our office and Mr. Smith should have that report as well.

"She provided some information as to staying at the Knights Inn with David Burriss and Michael Tinsley on the day of the white Jeep incident. She admits to hiding Mr. Burriss in the bathroom when the cops showed up.

"And she told detective Bridges that during that time frame Mr. Burriss would tell her he was going out to do work and she understood that to mean stealing cars. She told Detective Bridges about the incident at the car wash . . . that Mr. Burriss was with a man named Darrell in a stolen white Ford Taurus. She didn't put Michael Tinsley in the Taurus with them.

"She said she was not with them during the Overland Park robbery. She knew what car wash they were talking about, the one by the Knights Inn. She said Darrell came down to the hotel in the white car saying they had to go because the cops were coming. David was not with him. Ms. Gleese was only told that he got a truck.

"And then she started telling Detective Bridges there was more than one red truck Mr. Burriss stole and she had trouble keeping them—which car went with which event."

In her last interview, after the jury had been sworn in, Gleese told Detective Bridges that Smith, Tinsley, and Burriss told her they were going to work and left the Knights Inn for 30 to 45 minutes. Smith and Tinsley came back telling her to get her things because the cops were in the area. They then drove to QuikTrip, where Burriss was waiting in a red truck. Gleese and Tinsley got into the truck with Burriss, and the three of them drove to Platte City, where Burriss stole another red truck. Burriss and Gleese took that truck back to Kansas City, while Tinsley dropped off Cramer's truck somewhere else in Kansas City.

8

Burriss argues that while Gleese had spoken with law enforcement two times before, she provided new and contradictory statements to the State after the district court had already sworn in the jury. According to Burriss, these changes came not only as a surprise, they substantially changed the posture of the case for the defense. Furthermore, Tinsley might have refused to testify because Gleese's new statements implicated him in the crime. Burriss claims these unexpected changes unfairly prejudiced the defense and the district court erred in allowing Gleese to testify.

The State argues Gleese's new statements only provided additional information and were not in conflict with her prior statements. Since witnesses sometimes have additional or refined information, the proper remedy for the situation was impeachment. Thus, the district court did not abuse its discretion in allowing Gleese to testify.

*Standard of review*

Generally speaking, all relevant evidence is admissible. K.S.A. 60-407(f). Even if evidence is relevant, however, a court has discretion to exclude it if the evidence's "probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." K.S.A. 60-445. An appellate court reviews any such determination for abuse of discretion. See *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

*Gleese's Testimony Was Not Unduly Prejudicial*

Gleese's new testimony had probative value but came as a surprise to both the State and the defense. She provided a second identification of Burriss as the robber and

9

added more details about what happened the night of the carjacking. The new information she provided, however, does not appear to conflict with her prior statements. Gleese had previously said she could not say if the man in the still photographs taken from the surveillance video were Burriss. After being shown the video shortly before trial, however, Gleese was able to identify the man as Burriss based on his alleged predilection for wearing white tank tops. Her story involving the trip to QuikTrip was also new information, but based on what the State claims, Gleese had already made statements that linked Burriss to a stolen red truck. While the QuikTrip story was certainly more inculpatory, it was consistent with her prior statements.

More importantly, the new information does not appear to have prejudiced Burriss' defense. Gleese's new statements were consistent with the State's theory of the case. Cramer had already identified Burriss as the perpetrator, and Gleese's identification was secondary to his. Furthermore, Tinsley had already provided a statement to police mentioning the trip to QuikTrip. Tinsley's details differed somewhat from Gleese's about the trip because in his statement Burriss had returned to the Knights Inn driving a red truck and urged Tinsley, Gleese, and Devault to leave quickly and go to the QuikTrip. Both statements, however, were equally inculpatory for Burriss. Thus, prior to Gleese's new statements, the defense already knew someone would be able to identify Burriss as the carjacker and either Tinsley or Burriss had rushed Gleese out of the Knights Inn and to the QuikTrip on the night of the carjacking. This gave Burriss a reasonable opportunity to anticipate the State would offer such evidence.

The new information from Gleese also did not change Burriss' theory of defense. Burriss primary defense argument was that Minton was the perpetrator. None of the information provided affected this defense or required Burris to explain information that he had not already had the chance to prepare for. Additionally, Burriss argued at trial the police investigation of the incident was not well orchestrated. Since the police did not

10

show Gleese the video until the day before trial, this would have fit well with this defense argument.

Burriss also argues the new information from Gleese implicated Tinsley, who was a key witness for the defense. Because the evidence implicated Tinsley, Burriss argued Gleese's testimony might adversely affect Tinsley's. Prior to deciding whether to let Gleese testify, however, the district court discussed Tinsley's possible testimony. The parties agreed Tinsley would still testify without invoking the Fifth Amendment as long as counsel avoided the subject of the stolen vehicles.

Perhaps most importantly the district court made sure Gleese was available to speak with defense counsel prior to her testimony. Gleese was also susceptible to impeachment on cross-examination. Because the court took a number of measures to ensure that Gleese's testimony would not unfairly prejudice the defense, the court's decision to allow Gleese to testify was reasonable and not an abuse of discretion.

*Harmless error*

Even if the district court abused its discretion in allowing Gleese to testify, the error was harmless. In order to find an error harmless, we must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The party benefiting from the error always bears the burden of proving it harmless under this standard. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). Where an error implicates a statutory but not federal constitutional right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

11

The admission of Gleese's testimony implicates Burriss' statutory right not to have prejudicial evidence admitted against him. See K.S.A. 60-445. The State bears the burden of demonstrating there is no reasonable probability the error affected the outcome of the trial. In its brief, the State points out a significant amount of other evidence identified Burriss as the perpetrator. Cramer unhesitatingly identified Burriss in the photo lineup. Burriss' DNA was found at the Knights Inn, putting him in the vicinity of the carjacking, and his DNA could not be excluded from the sample taken from Cramer's steering wheel. While Gleese's identification of Burris in the video rested partly on his gait and his mannerisms, the jury also had the opportunity to watch the surveillance video and observe Burriss. Thus, the jury could make its own conclusion on the accuracy of Gleese's identification.

Gleese was also subject to cross-examination, and defense counsel was able to damage her credibility on a number of grounds. She admitted she was using methamphetamines at the time of the incident and they sometimes affected her ability to recall days. Defense counsel brought up inconsistencies in Gleese's statement about the period of time in which these events occurred. Defense counsel also emphasized Gleese was Tinsley's girlfriend at one point, and she had potential bias towards Minton. On direct examination, the State had elicited testimony of Gleese's prior crimes of dishonesty. Given the other evidence presented at trial and the damage done to Gleese's credibility on the stand, there is not a reasonable probability that her identification and her story regarding the trip to QuikTrip altered the verdict in this case.

Burriss argues that impeachment was not a sufficient remedy because while he had an audio recording of Gleese's February statement, the statement could not be used. According to Burriss, the audio recording was "all over the board" and involved a number of hearsay and derogatory statements about him and could not be redacted. Burriss does not explain why the audio recording could not be redacted. Furthermore, as the State points out, the audio recording is not part of the record on appeal, so we cannot

12

review this claim. See *Schmidt v. Shearer*, 26 Kan. App. 2d 760, 774, 995 P.2d 381 (1999) ("An appellant bears the burden to designate a record sufficient to establish claimed error. Without an adequate record, the claim of alleged error fails.").

Burriss next argues the district court erred in denying his motion for a new trial. Burriss moved for a new trial, arguing (1) the district court erred in admitting misleading DNA evidence that there was a 33% probability Burriss' DNA was on the steering wheel; (2) the State committed prosecutorial misconduct by questioning Tinsley in a manner that forced him to invoke his Fifth Amendment right in front of the jury; and (3) cumulative error deprived him of a fair trial. The court denied Burriss' motion.

Burriss argues the DNA evidence regarding the steering wheel was misleading and inconclusive as to any material fact. He further argues the State intentionally pursued a line of questioning that would force Tinsley to invoke his Fifth Amendment rights, damaging his credibility as a defense witness. The State argues that not only is DNA evidence generally admissible in Kansas, Burriss appears to misunderstand the evidence because it was actually favorable to the defense. Additionally, the State's questions to Tinsley were not incriminating, and the State itself was adversely affected because it could not complete its cross-examination once Tinsley invoked his Fifth Amendment rights.

*Standard of review*

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 22-3501. An appellate court reviews a district court's decision on a motion for new trial for an abuse of discretion. *State v. Soto*, 301 Kan. 969, 977, 349 P.3d 1256 (2015); *State v. Laurel*, 299 Kan. 668, 676, 325 P.3d 1154 (2014).

*DNA Statistical Evidence*

13

The district court did not abuse its discretion in denying Burriss' motion for a new trial on the basis of the statistical weight of the DNA evidence. As the State points out, statistical analysis of DNA profiles using population studies is generally accepted in the scientific community and is thus admissible in Kansas. *State v. Dykes*, 252 Kan. 556, 562, 847 P.2d 1214 (1993). A court may still exclude such evidence, though, if it is irrelevant, prejudicial, or susceptible to other traditional challenges to evidence. 252 Kan. at 563.

Burriss argues Carroll's "one-in-three" probability is more misleading than probative, but Burriss misstates Carroll's testimony. At trial, Carroll testified the DNA sample from the steering wheel had at least three contributors. When the State asked about the statistical weight of her conclusion that Cramer could not be excluded as a possible contributor to the sample, Carroll explained, "[M]y conclusion is one in three. So that statistic is low. And it means that if I were to poll any of you, you would have a one-in-three chance of your DNA . . . being able to be excluded from the DNA profile." Carroll then testified Burriss could not be excluded as a possible contributor. The State again asked about the statistical weight of this conclusion, and Carroll responded, "It's the same for anybody being compared because it's the statistical probability for the evidence, so it's one in three." Carroll did not testify there was a 33% chance Burriss contributed to the DNA sample. She testified a randomly chosen person had a one-in-three chance of not being excluded from the sample. This evidence demonstrated that while the DNA profile showed Burriss could not be excluded from the sample, it was not a particularly solid or meaningful conclusion. Thus, the "one in three" statistic actually weighed in Burriss' favor.

In fact, the most misleading part of Carroll's testimony appears to be the defense's cross-examination. Defense counsel misstated Carroll's testimony while questioning her:

14

"[DEFENSE COUNSEL:] That's one profile generated from the steering wheel. And bottom line, couldn't exclude my client. There's a one-out-of-three chance that his DNA is present in that steering wheel DNA right?

"[CARROLL:] Correct. There's–taking one person randomly from the population they would have a one-in-three chance of their DNA cannot be excluded from that profile.

. . . .

"Q. And from the steering wheel, there's a one in three chance that it could be my client's DNA?

"A. That's correct. A random person would have a one in three chance of their DNA matching or cannot be excluded from that profile."

Looking at this exchange, if anyone misled the jury to speculate there was a 33% chance Burriss' DNA was on the steering wheel, it was defense counsel. Because DNA profiling is generally admissible and the evidence in this case was favorable to Burriss, a reasonable person could agree with the district court's decision not to grant a new trial based on the admission of this evidence.

*Tinsley's Invocation of Fifth Amendment*

The district court also did not abuse its discretion in denying Burriss' motion for a new trial based on his charge of prosecutorial misconduct in questioning Tinsley. We review allegations of prosecutorial misconduct using a two-step analysis. First, we determine whether the prosecutor's questions or actions were within the wide latitude allowed the prosecutor. Then, if there was misconduct, we determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). In the second step of this analysis, we consider (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the

misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014).

Prior to the beginning of the trial, the State informed the district court that based on Gleese's new information, Tinsley might invoke his Fifth Amendment rights on the stand. The parties discussed the issue with Tinsley and Tinsley's attorney, Stacey Schlimmer. Schlimmer stated Tinsley "has a Fifth Amendment right to assert when it comes to any vehicles that may be mentioned. There's a white Jeep, apparently, the red Dodge, any identification of vehicles or whether he's been in them or not, I think he would need to assert his Fifth Amendment right." When questioned further, Schlimmer added:

> "I don't think he would have a Fifth Amendment right if you ask him if he saw anybody drive a specific vehicle. But whether he was either physically in a vehicle or whether he was involved with any of the vehicles, I think at that point, he would need to assert his Fifth Amendment.
>
>      . . . .
>      "Whether he was near or in or his DNA was located in any vehicle, then I think he would need to assert his Fifth Amendment right . . . ."

The State did not call Tinsley in its case-in-chief, but Burriss called him as a defense witness. Tinsley testified he did not think the man in the surveillance video was Burriss. He believed the man was Minton.

Because Burriss' questions on direct related to Tinsley's police interview, the State asked several questions in cross-examination about statements Tinsley made to police. Some of these statements included what had happened at the Knights Inn on August 24, 2011. The State asked Tinsley if he had told police he was at the Knights Inn with Gleese and Devault when Burriss and a black male showed up urging them to leave quickly. The State then asked, "Did you tell the police that you and Mr. Burriss and Kelly Devault and

16

Misty Gleese then left and went to the QT?" Schlimmer started to interject, but before she could finish speaking, Tinsley invoked his Fifth Amendment rights.

The State's questions fell within the wide latitude granted to prosecutors. Moreover, the record does not suggest gross or flagrant behavior or ill will on the part of the State. In direct examination of Tinsley, Burriss asked Tinsley about statements he had made to police in an interview. In cross-examination, the State was asking questions about statements Tinsley had made in the same interview. Burriss objected to the line of questioning as outside the scope of direct, but the district court ruled Burriss had questioned Tinsley about the interview, so the State was also allowed to question Tinsley about the interview.

Additionally, the State raised the issue of Tinsley invoking the Fifth Amendment to the district court in the first place. The parties had agreed Tinsley would not answer questions that would place him in or near any vehicles. While the State's line of questioning may have been close to this subject matter, the State stayed within the parameters set by Schlimmer. While Schlimmer later felt Tinsley might need to assert his Fifth Amendment right to the line of questioning pursued by the State, it was not because of any cars the State might mention. Schlimmer noted Tinsley now needed to answer whether he was with Burriss, and that too might be incriminating. This discussion came after the question was asked, however, so the State did not ask the question knowing Tinsley would assert the Fifth Amendment.

After Tinsley invoked his Fifth Amendment right, the State moved to have his entire testimony stricken from the record. The State argued that because it was no longer able to ask Tinsley questions regarding his previous statements to police, it would not be able to impeach him with prior inconsistencies in his identification. The district court ultimately denied the State's motion to strike Tinsley's testimony. Because the State originally brought up Tinsley's Fifth Amendment issues to the court, stayed within the

17

parameters set by Tinsley's attorney, and was unable to complete its impeachment once Tinsley invoked his Fifth Amendment rights, the record does not support a finding of prosecutorial misconduct. Thus, the court did not abuse its discretion in denying Burriss' motion for a new trial based on this argument.

Burriss next contend the district court erred in failing to give a limiting instruction regarding evidence of his prior bad acts.

Both the State and Burriss proposed a limiting instruction regarding evidence of other crimes he may have committed. During the jury instructions conference, the district court told counsel it had not included a limiting instruction and asked if either party was requesting the instruction. Defense counsel responded, "We're withdrawing our request for that instruction, Judge."

Burriss argues that failure to give the limiting instruction was clearly erroneous. He contends the jury may have concluded he was involved in other property and violent crimes mentioned during the trial. Thus, a limiting instruction was necessary to counter the effects of this evidence on Burriss' credibility.

The State argues Burris invited error when he withdrew his request for the limiting instruction, therefore his claim is barred from appellate review. Even if we would consider the issue, the State contends it did not present any evidence of Burriss' prior bad acts. Furthermore, the district court did not commit clear error because there was sufficient evidence for the jury to convict Burriss without any evidence of prior bad acts.

*Invited Error*

An appellate court does not need to consider whether the giving or failing to give a jury instruction was clearly erroneous when the challenge is precluded by the invited

18

error rule. *State v. Jones*, 295 Kan. 804, 811-12, 286 P.3d 562 (2012). This case is similar to *State v. Hernandez*, 44 Kan. App. 2d 524, 239 P.3d 103 (2010). In *Hernandez*, the district court asked the defendant if she wished to include a lesser included offense instruction, and the defendant declined. The *Hernandez* court found the invited error doctrine barred the defendant's claim that the district court erred in not giving the lesser included offense instruction. 44 Kan. App. 2d at 528. Similarly, the court asked Burriss if he was requesting for the jury to receive the limiting instruction, and Burriss said he was no longer requesting the instruction. Thus, Burriss' claim is invited error and not subject to appellate review.

*Standard of Review*

In any event, Burriss must demonstrate that failure to give the instruction was clearly erroneous because he did not object before the jury retired. See *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). An appellate court uses a two-step process in determining whether the challenged instruction was clearly erroneous. First, we must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. Second, if the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014), *cert. denied* 135 S. Ct. 728 (2014). Reversibility is subject to unlimited review and is based on the entire record. The party claiming error in the instructions has the burden to prove the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*The Instruction Was Not Factually Appropriate.*

When evidence of a defendant's prior bad acts are presented at trial, the district court must give a limiting instruction informing the jury of the specific purpose for the

evidence's admission. *State v. Richmond*, 289 Kan. 419, Syl. ¶ 7, 212 P.3d 165 (2009). If, however, the evidence, viewed in the light most favorable to the defendant or the requesting party, would not have supported the instruction, the instruction is not factually appropriate. *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015). In this case, the State does not appear to have presented any evidence of Burriss' prior bad acts, making a limiting instruction factually inappropriate.

Burriss points to a number of incidents that he argues constitute prior bad acts, but all of them are evidence of other crimes or possible crimes in which the State did not directly implicate him. Burriss notes the evidence that someone had broken into Cramer's truck after he retrieved it from the tow lot, but before Detective Bridges had come to collect evidence. He contends this implicated him in the crime. The State, however, did not put on any evidence or even suggest that Burriss was the one who had broken into the truck. The State offered this evidence merely to explain the condition of the truck when Detective Bridges came to take photographs.

Burriss claims Agent Simmons' testimony regarding the counterfeit currency investigation also constituted evidence of a prior bad act. Burriss claims Agent Simmons mentioned the investigation, but the State promptly redirected him, leaving the jury with the impression that Burriss may have been a part of the counterfeit currency investigation. Agent Simmons testified he was investigating Minton.

Burriss also points to portions of Gleese's testimony as evidence of his prior bad acts. Gleese testified that before Smith, Tinsley, and Burriss left the Knights Inn the night of the carjacking they said they were going to work. She said she interpreted this to mean they were going to steal. She did not, however, testify as to why she interpreted the statement this way, and she certainly did not say it was because Burriss had stolen cars in the past. Burriss also argues Gleese implicated him in the physical disturbance at the Knights Inn. The evidence at trial, however, only established that Burriss was the victim

20

of a battery. No one presented evidence of the extent of Burriss' participation in the incident.

Lastly, Burriss notes the testimony about the police towing the white Jeep outside the Knights Inn. According to Burriss, this suggests "improper activity" regarding the Jeep and that someone had stolen the Jeep. While the police towed the Jeep because it was a stolen vehicle, the evidence at trial provided no information as to why the police towed it. As the State points out, the police could have towed it for a number of reasons, including it being illegally parked or being evidence in the assault on Burriss. Furthermore, even if the evidence did show the Jeep was stolen, it did not suggest that Burriss was the one who stole the Jeep or that he even knew it was stolen.

Burriss' argument is essentially that the State presented evidence that other crimes happened or may have happened, and through one or several inferences, the jury may have concluded that he was involved in those crimes. This, however, does not make the evidence presented by the State to be evidence of Burriss' prior bad acts. See *Williams*, 299 Kan. at 552, (noting evidence of association with someone who has committed a crime is not a prior crime or civil wrong covered by K.S.A. 60-455); *State v. Elston*, No. 98,344, 2008 WL 4291518, at *1 (Kan. App. 2008) (unpublished opinion) (noting testimony of two police officers that they knew defendant is not evidence of defendant's prior bad acts). Because the jury did not hear any actual evidence of Burris's prior bad acts, the limiting instruction was not factually appropriate.

*Harmless Error*

Even if the district court erred in not giving a limiting instruction, any error was harmless. In order to reverse, we must be firmly convinced the jury would have reached a different verdict if the court had given a limiting instruction. See *Clay*, 300 Kan. at 408. In this case, however, the State presented evidence of other crimes only as context for the

21

evidence for the charges against Burriss. Whether the jury inferred Burriss was connected to any of these crimes and, thus, convicted him based on his propensity to commit crimes is only speculation. Furthermore, the State presented plenty of other evidence at trial that implicated Burriss in the actual crimes charged. Because we are not firmly convinced the jury would have reached a different outcome with a limiting instruction, any error was harmless.

Burriss also argues the cumulative effect of numerous errors deprived him of his right to a fair trial. In addition to the errors discussed previously, Burriss also contends the court erred in refusing his request that Gleese take a drug test on the day she testified.

*Standard of Review*

Under a cumulative error analysis, an appellate court determines whether the totality of the circumstances establish that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judges dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. *Betancourt*, 299 Kan. at 147. A single error cannot constitute cumulative error. *Williams*, 299 Kan. at 566.

*No Cumulative Error*

As for the issues discussed above, there were no errors, and even if there were, they were harmless. Furthermore, in the case of each alleged error, the district court solicited arguments from both parties and appears to have carefully considered those

arguments before making any ruling. As for Burriss' request that Gleese take a drug test, Gleese denied she was currently using methamphetamines, and Burriss was unable to provide any evidence which suggested she was under the influence of drugs. The burden of establishing a witness' incompetency lies with the challenger, and the disqualification of a witness lies within the discretion of the court. *State v. Warden*, 257 Kan. 94, 123, 891 P.2d 1074 (1995). Because Burriss could not produce any reasonable basis to order Gleese to take the drug test, the court did not abuse its discretion in refusing his request. Finally, the State presented significant evidence of Burriss' guilt at trial. Thus, cumulative error did not deprive Burris of a fair trial.

*Sentencing Issue*

Burriss also argues that under *State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015), his pre-1993 burglary juvenile adjudication should not have been categorized as a person felony. He notes, however, his criminal history would remain the same because he has at least three other prior person felonies. The State agrees Burriss' 1991 burglary should have been categorized as a nonperson felony but argues the issue is irrelevant. The record does not indicate the district court relied on this adjudication in sentencing Burriss, and his criminal history would remain the same even without the 1991 burglary.

*Standard of Review*

A court may correct an illegal sentence at any time, and a defendant may challenge the classification of prior convictions for the purposes of determining his or her criminal history score even if the defendant did not object at sentencing. K.S.A. 22-3504(1); *Dickey*, 301 Kan. at 1032. Whether a prior conviction or juvenile adjudication was properly classified as a person or nonperson crime for criminal history purposes raises a question of law subject to unlimited review. *State v. Murdock*, 299 Kan. 312, 314, 323 P.3d 846 (2014), *modified by Supreme Court order September 19, 2014,*

23

*overruled on other grounds by State v. Keel*, 302 Kan. 560, 357 P.3d 251 (2015); see also *Makthepharak v. State*, 298 Kan. 573, 578, 314 P.3d 876 (2013) (Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which this court has unlimited review.).

Under *Dickey*, Burriss' 1991 juvenile burglary adjudication cannot be classified as a person felony because doing so would require judicial factfinding in violation of Burriss' constitutional rights under *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). *Dickey*, 301 Kan. at 1036-37. This does not require resentencing in Burriss' case, though. First, the record does not establish the district court relied on this adjudication in determining Burriss criminal history score. Second, even without the incorrectly categorized burglary adjudication, Burriss' criminal history would still have been an A because he had four adult person felony convictions. In fact, at sentencing, Burriss raised a challenge to the classification of his juvenile adjudication under *Murdock*, and the court noted the classification of his juvenile adjudication would not change the classification of his criminal history because he had three other person felonies. Thus, Burriss is not entitled to relief based on the incorrect classification of his juvenile burglary adjudication.

Affirmed.